Jose C. RODRIGUEZ, Petitioner,

v.

Warren YOUNG, Respondent.

No. 87–C–1172.

United States District Court,
E.D. Wisconsin.

March 10, 1989.

Mark J. Rogers, Angermeier & Rogers, Milwaukee, Wis., for petitioner.

Daniel J. O'Brien, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent.

OPINION AND ORDER

WARREN, Chief Judge.

This is a petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. The petitioner is currently incarcerated in the Waupun Correctional Institution in Waupun, Wisconsin, following his conviction in Milwaukee County Circuit Court for first-degree murder.

The petitioner claims that he is being held unlawfully because his trial was violative of provisions of the United States Constitution ensuring his rights to due process and effective assistance of counsel.

After an examination of the record, the Court denies the petition for the reasons explained below.

## I. PROCEDURAL BACKGROUND

The petitioner, Jose C. Rodriguez, was convicted by a jury in Milwaukee County Circuit Court of first-degree murder. Following his conviction, the petitioner unsuccessfully moved the trial court for a new trial. On direct appeal, the Wisconsin Court of Appeals affirmed the judgment of conviction and the denial of his motion for a new trial. The petitioner unsuccessfully sought review by the Wisconsin Supreme Court and the United States Supreme Court.

The petitioner then moved the trial court for post-conviction relief pursuant to Wis. Stats. § 974.06. After an evidentiary hearing, the trial court denied the petitioner's motion for post-conviction relief. The Court of Appeals affirmed and the Wisconsin Supreme Court and the United States Supreme Court denied review. The petitioner then filed this petition for a writ of habeas corpus.

The petitioner challenges his conviction on the following grounds:

(1) the former Wisconsin Criminal Jury Instruction Number 1100 unconstitutionally shifted the burden of persuasion to the petitioner in violation of his due process rights protected by the fourteenth amendment,

(2) the former Wisconsin Criminal Jury Instruction Number 1100 unconstitutional-

ly shifted the burden of production of evidence to the petitioner in violation of his sixth amendment right to jury trial by effectively directing the jury to reach a verdict against the defendant on the issue of intent to kill,

(3) the evidence was insufficient to sustain his conviction,

(4) the trial court violated the petitioner's due process rights by conditioning the giving of a theory of defense instruction upon the giving of a similar instruction on behalf of the prosecution,

(5) he was denied the effective assistance of counsel when his trial attorney failed to make a motion to suppress the identification testimony of Maria Ramos,

(6) he was denied the effective assistance of counsel when his trial attorney waived his right to submit a theory of defense instruction to the jury,

(7) he was denied the effective assistance of counsel when his trial attorney failed to pursue his request to take a polygraph examination,

(8) he was denied the effective assistance of counsel when his trial attorney failed to insist that the court interpreter give a verbatim translation of Maria Ramos' testimony, and

(9) he was denied his constitutional right to confront and cross-examine his accusers when the court interpreter failed to give a verbatim translation of Maria Ramos' testimony.

This Court previously dismissed the petitioner's first ground (his argument that former Wisconsin Criminal Jury Instruction Number 1100 unconstitutionally shifted the burden of persuasion to the petitioner) as an abuse of the writ. Court's Decision and Order, October 26, 1988. The Court stated as follows:

> The state argues that this petition should be dismissed at least with respect to the challenge to former Wisconsin Criminal Jury Instruction Number 1100 pursuant to 28 U.S.C. § 2254, Rule 9(b). Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District

Courts provides, in relevant part, as follows:

> *(b) Successive petitions.* A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits.

"The determination of whether a petitioner is precluded from relitigation on the merits of a previously rejected petition is made by resort to the three-step test set forth in *Sanders v. United States." Jacks v. Duckworth,* [857 F.2d 394] No. 86–C–460 (7th Cir. September 13, 1988). In *Sanders v. United States,* 373 U.S. 1 [83 S.Ct. 1068, 10 L.Ed.2d 148] (1963), the Court stated that:

> Controlling weight may be given to denial of a prior application for federal habeas corpus or § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

*Id.* at 9 [ (15) 83 S.Ct. at 1077]. The petitioner admits on the face of this petition that the grounds raised in his first petition [Case No. 82–C–339, filed in 1982] are the "same grounds set forth in paragraph 12C of this petition," the challenge to former jury instruction number 1100. Moreover, the record is clear that the federal court rejected the petitioner's challenge to former Wisconsin Criminal Jury Instruction Number 1100 on the merits. Thus, the focus is on whether the petitioner has satisfied his burden of showing that the ends of justice warrant a fresh look at his claims. *Id.* "If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law." *Id.* at 10 [ (16) 83 S.Ct. at 1078]. The petitioner here asserts that the United States Supreme Court's decision in *Francis v. Franklin* constitutes an intervening change in the law.

*Francis v. Franklin,* 471 U.S. 307 [105 S.Ct. 1965, 85 L.Ed.2d 344] (1985). However, the Seventh Circuit Court of Appeals has expressly upheld the constitutionality of former jury instruction number 1100 in light of *Francis v. Franklin. Fencl v. Abrahamson,* 841 F.2d 760, 770 (7th Cir.1988).... Despite the petitioner's arguments to the contrary, *Francis v. Franklin* does not constitute an intervening change in the law warranting relitigation of his claim in the interest of justice. Therefore, the Court dismisses the petitioner's challenge to former Wisconsin Criminal Jury Instruction Number 1100 as an abuse of the writ.

Court's Decision and Order, October 26, 1988.

■ The Court now dismisses the petitioner's second ground (his argument that former Wisconsin Criminal Jury Instruction No. 1100 unconstitutionally shifted the burden of production of evidence to the petitioner) as an abuse of the writ.

"The determination of whether a successive petition for a writ of habeas corpus constitutes an abuse of the writ is, like the habeas remedy itself, governed by principles of equity." *United States ex. rel. Cyburt v. Lane,* 612 F.Supp. 455, 463–464 (D.C.Ill.1984). The Court should balance "the need to protect the courts from those who would misuse or subvert the judicial process with needless piecemeal litigation against preservation of the exalted role of habeas corpus as guardian against unjust imprisonment." *Id.*

In this instance, the petitioner should have raised all challenges to former Wisconsin Criminal Jury Instruction No. 1100 in his first petition, rather than proceed with this type of piecemeal litigation. In 1982, the petitioner argued that former Wisconsin Criminal Jury Instruction No. 1100 unconstitutionally shifted the burden of persuasion to the petitioner. The federal district court determined that this issue was properly before it because the Wisconsin Supreme Court had previously held that the jury instruction was constitutional, and thus, it would have been futile to require

the petitioner to exhaust his state remedies on the issue. Although this Court has allowed the petitioner to proceed with the seven new and different grounds that were not exhausted at the time of his first petition (and did not come within the Court's futility exception), the Court will not allow the petitioner to proceed on this second challenge to former Wisconsin Criminal Jury Instruction No. 1100. "[I]f a prisoner deliberately withholds one of the two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings ... he may be deemed to have waived his right to a hearing on the second application presenting the withheld ground." *Sanders v. United States,* 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). "Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay." *Id.*

The Court addresses the seven remaining grounds for habeas relief, and for the reasons stated in this opinion, the Court denies the petition for a writ of habeas corpus.

## II. FACTS

At about 9:00 p.m. on June 14, 1976, Ernesto Guzman, also known as Ratone, was knifed to death. Just prior to his death, Ratone, a heroin seller, sold some heroin to the petitioner's common law wife, Maria Rodriguez, who short-changed Ratone on the purchase price. Ratone followed Maria Rodriguez as she walked south on Sixth Street toward Pierce Street in Milwaukee, Wisconsin, and he caught up to her at the intersection of Sixth and Pierce Streets. Soon thereafter, there was a struggle during which Ratone was killed. In the immediate area at the time of the struggle were Maria Rodriguez, Edgar Alicea, Edwin Alicea, Jose Rodriguez, and Manuel Navarro (Jake). Also nearby, standing against a wall outside of a tavern, was Maria Ramos. At the time of this incident, Maria Ramos had known Edgar Alicea, Edwin Alicea, and Jose Rodriguez for about one year. (Trial transcript at 367 (Aliceas),

344–345 (Jose Rodriguez).) At the time of the trial, Maria Ramos was living with Sefrino Garcia, who was friends with Jake Navarro. (Trial transcript at 340–341.)

Maria Rodriguez testified that the petitioner "came and pushed and told him [Ratone] not to be touching me because I was his wife and that was wrong." (Trial transcript at 498.) She testified that Jake Navarro was with her husband at the time. (Trial transcript at 499.) She further testified that in response to her husband's actions, Ratone "started talking, and Jake grabbed him [Ratone] and stabbed him." (Trial transcript at 499.) She stated that "I was standing by my husband, and I called him, and he stood there like he was in shock or something, like he didn't believe it." (Trial transcript at 500.) She also stated that she saw Jake with a knife. (Trial transcript at 500.)

Maria Ramos testified that she witnessed a struggle between Ratone, Edgar Alicea and Jose Rodriguez. (Trial transcript at 310.) She further testified that she "saw them fighting, and Edgar was holding Ratone" and she "saw the hand of Boogie (Jose Rodriguez) into the chest of Ratone." (Trial transcript at 313.)

Edgar Alicea testified that he saw a scuffle between Ratone, Jake Navarro, and Jose Rodriguez. (Trial transcript at 220.) Edwin Alicea also testified that he saw Ratone, Jake and Jose Rodriguez involved in a struggle. (Trial transcript at 440–441.) After observing the struggle for a moment, the Aliceas drove around the block and when they returned they saw Ratone on the ground. (Trial transcript at 446–447.) Maria Ramos testified that the Aliceas had changed clothes before returning to the scene. (Trial transcript at 369–370.)

Additional facts will be developed in the course of this opinion.

## III. INSUFFICIENT EVIDENCE
### A. *Cause and Prejudice*

■ On direct appeal, the petitioner challenged the sufficiency of the evidence to support his conviction on the grounds that Maria Ramos' identification of him was so unnecessarily suggestive as to create a substantial likelihood of misidentification. The appellate court determined that the petitioner's failure to challenge the identification testimony before trial as required by Wis.Stat. § 971.31(2) constituted a waiver of his rights. *Rodriguez v. Wisconsin,* 111 Wis.2d 701, 332 N.W.2d 312 (Ct.App.1983). The appellate court therefore considered the identification evidence in assessing the sufficiency of the evidence.

The petitioner asserts that even though the appellate court applied Wis.Stat. § 971.31 as a procedural bar, this Court should address the merits. Before this Court may address the merits of the petitioner's challenge, however, this Court must find a showing of cause and actual prejudice. *See Weber v. Israel,* 730 F.2d 499, 502 (7th Cir.1984) ("when a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice").

"The mere fact that counsel ... failed to raise a claim despite recognizing it does not constitute cause for a procedural default." *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). This is true "so long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington.*" [1] *Murray v. Carrier,* 106 S.Ct. at 2645–2646. Petitioner's trial counsel testified at a post-conviction hearing that he considered bringing a motion to suppress the identification testimony of Maria Ramos, however, he decided against it because Maria Ramos had known Jose Rodriguez for about one year before the night of June 14, 1976, and it was his policy not to bring a motion to suppress identification testimony where the parties knew each other. The trial court and appellate court determined that counsel's failure to bring a motion to suppress the identification testi-

---

**1.** "[I]neffective assistance of counsel is not the only sufficient cause. A habeas petitioner can also establish cause by showing 'some external impediment preventing counsel from constructing or raising the claim.'" *Buelow v. Dickey,* 847 F.2d 420, 426–427 (7th Cir.1988).

mony did not constitute ineffective assistance of counsel. This Court agrees that counsel's performance was not constitutionally ineffective under the standard established in *Strickland v. Washington.* See discussion at part V. of this opinion. Thus, the petitioner has failed to carry his burden of showing cause for the procedural default. The Court therefore need not determine whether the petitioner carried his burden of showing actual prejudice. *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986).

### B. *Manifest Injustice*

 "There is yet one last avenue open to habeas petitioners who waived their claims through procedural defaults in state courts and cannot satisfy the cause-and-prejudice requirement." *Buelow v. Dickey*, 847 F.2d 420, 427 (7th Cir.1988).

*Murray v. Carrier* created a limited exception to the forfeiture rule of [*Wainwright v.*] *Sykes* [433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)] in circumstances of manifest injustice or fundamentally unfair incarceration:

> We remain confident that, for the most part, "victims of a fundamental miscarriage of justice will meet the cause-and-prejudice standard." [*Engle v. Isaac*, 456 U.S. 107 at 135, 102 S.Ct. 1558 at 1576, 71 L.Ed.2d 783 (1982).] But we do not pretend that this will always be true. Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.

*Carrier*, 106 S.Ct. at 2650. *See also Engle*, 456 U.S. at 135, 102 S.Ct. at 1576. Thus, a federal court, notwithstanding the state procedural bar, may set aside the cause-and-prejudice test and permit a habeas petition if, due to a fundamentally unjust trial, an innocent defendant was convicted. *Buelow v. Dickey*, 847 F.2d at 427.

*Buelow v. Dickey*, 847 F.2d at 427.

To determine whether the petitioner was a victim of a miscarriage of justice, the Court reviewed the transcripts of the trial. The Court determined that a miscarriage of justice did not result from the admission of Maria Ramos' identification testimony into evidence at the trial. Maria Ramos' identification of the petitioner, viewed under the totality of the circumstances, was reliable despite the suggestive procedure.

### 1. Identification Testimony

On June 14, 1976, the night Ratone was killed, Maria Ramos went to the police station and looked at photographs. (Trial Transcript at 327, direct-examination of Maria Ramos.) She selected photographs of Edgar Alicea, Eddie Alicea, and Ratone as people involved in the incident. (Trial transcript at 327.) Maria Ramos does not remember whether she saw a photograph of the petitioner that night. (Trial transcript at 375, cross-examination of Maria Ramos.)

On the morning of June 15, 1976, Maria Ramos went to the police station and she looked at photographs. On that day, Maria Ramos saw a photograph of the petitioner. (Trial transcript at 331, direct-examination.) Maria Ramos testified at trial that she told the detective "that it [the photograph] looked like him, but I rather identify him with his back." (Trial transcript at 333, direct-examination of Maria Ramos.)[2] Detective Gary Schreiber, who testified at trial based on a written report by Detective Sandoval, testified that Maria Ramos identified a photograph of the petitioner on June 15, 1976 as a person known to her only as "Boogie", and further stated that the man she so identified stabbed the victim in the chest area and also held the victim "while the subject in photo no. 8 [Edgar Alicea] stabbed the victim about the chest area." (Trial transcript at 648–649, re-direct testimony of Detective Schreiber.)

On the morning of June 16, 1976, Detective Schreiber took Maria Ramos to the

---

**2.** On cross-examination, she stated that she told the police that "that was Boogie [Jose Rodri-guez] ... that I had to see his back to identify him." (Trial transcript at 376.)

office of Assistant District Attorney Richard Klinkowitz and had her seated in that office while Detective Sandoval brought the petitioner to the District Attorney's office. (Trial transcript at 592, direct-testimony of Detective Schreiber.) Detective Schreiber testified as follows:

> Maria Ramos was in Assistant District Attorney Klinkowitz' office, and Detective Sandoval had the defendant in the outer office of the District Attorney's Office.
>
> Detective Sandoval was standing approximately the length of this courtroom away from Assistant District Attorney Klinkowitz' office. I stepped out in the hall to direct Detective Sandoval to bring the defendant into Mr. Klinkowitz' office at which time Detective Sandoval was standing with his back to me, and the defendant was standing alongside with his back toward me. I brought Maria Ramos to the District Attorney's Office and directed her attention to the front of the office. I asked her if she knew Detective Sandoval; she stated no. I asked her if she saw Detective Sandoval standing anywhere in the District Attorney's Office; she stated no, but stated that the man in the white shirt is Boogie. That man was identified as the defendant standing alongside of Detective Sandoval.

(Trial transcript at 592, direct-examination of Detective Schreiber.)

Maria Ramos testified regarding this sequence of events from June 14, 1976 to June 16, 1976 as follows:

Q: Did you select photographs of people involved in this incident?

A: Yes.

Q: And whose photographs did you select?

A: Edgar and Eddie.

Q: By "Eddie" you mean Edwin Alicea?

A: His brother.

Q: And who else?

A: Ratone.

Q: And who else?

A: That night?

Q: Yes, when you went to select the people who you told the police had participated in this offense, whose pictures did you select?

A: Boogie's, Edgar and Eddie and Ratone.

Q: Did you select Boogie's picture as well?

A: Well, I didn't know it was Boogie. I didn't know it was Boogie that night.

Q: When did you know it was Boogie?

A: When I identified his back.

Q: When did you see his back?

A: At the District Attorney's.

Q: In the District Attorney's Office?

A: Yes.

Trial transcript at 327–328.

### 2. Admissibility of Challenged Identification Testimony

"A well settled two-part test is applied in determining the admissibility of challenged identification testimony," *Kubat v. Thieret,* 867 F.2d 351, 357 (7th Cir.1989).

First, the defendant must establish that the identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court considers whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification—or stated in the affirmative, whether the identification, viewed under the totality of circumstances, is reliable despite the suggestive procedure. *See Manson v. Brathwaite,* 432 U.S. 98, 107–14 [97 S.Ct. 2243, 2249–53, 53 L.Ed.2d 140] (1977); *Neil v. Biggers,* 409 U.S. 188, 198–199 [93 S.Ct. 375, 381–82, 34 L.Ed.2d 401] (1972); *Simmons v. United States,* 390 U.S. 377, 384 [88 S.Ct. 967, 971, 19 L.Ed.2d 1247] (1968); *Stovall v. Denno,* 388 U.S. 293, 302 [87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199] (1967); *United States v. L'Allier,* 838 F.2d 234, 239 (7th Cir.1988); *United States v. Kord,* 836 F.2d 368, 373 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 72 [102 L.Ed.2d 49] (1988); *United States v. Briggs,* 700 F.2d 408, 412–13 (7th Cir.), *cert. denied,* 461 U.S. 947 [103 S.Ct. 2129, 77 L.Ed.2d 1307] (1983); *United States v. Phillips,* 640 F.2d 87, 94 (7th

Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981).

*Kubat v. Thieret,* 867 F.2d 351, 357 (7th Cir.1989).

In this case, the petitioner is correct that the circumstances of the identification at the district attorney's office were less than optimal. While viewing photographs at the police station, Maria Ramos stated that the photograph of Jose Rodriguez "looked like him, but I rather identify him with his back." (Trial transcript at 333, direct-examination of Maria Ramos.) The detective later took Maria Ramos to the district attorney's office where the petitioner was standing alongside a detective at the front of the office with his back to Maria Ramos, approximately the length of a courtroom away from her. When Maria Ramos' attention was directed to the front of the office, she identified Jose Rodriguez. "The practice of showing suspects singly to persons for the purpose of identification and not as part of a lineup is usually questioned." *Rozga v. State,* 58 Wis.2d 434, 440, 206 N.W.2d 606 (1973) (citing *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). "Showing a suspect singly is necessary in situations where the usual lineup procedures are inadequate or simply cannot be employed, *Stovall v. Denno, supra;* for example, when a witness is seriously injured and about to die in a hospital. . . . Therefore, a claimed violation of due process of law because of a one-man lineup or showing photographs depends on '. . . the totality of [the] surrounding circumstances.'" *Rozga,* 58 Wis.2d at 440–441, 206 N.W.2d 606. In this case, there was no evident reason for a one-man lineup and the better procedure would have been a lineup at the police station. However, while the Court disapproves of the procedure used here, the Court's role on habeas review is "not to mandate optimal procedures to the state courts. Rather, the Court's role is to protect against constitutional error." *Kubat v. Thieret,* 867 F.2d 351, 358 (7th Cir.1989).

Based on the testimony at trial describing the identification procedure at the district attorney's office, the Court does not find that the procedure was so suggestive as to violate the petitioner's due process rights. There were several other persons present in the district attorney's office at the time Maria Ramos identified the petitioner. (Trial transcript at 592, direct examination of Detective Schreiber.) In addition, the detective only directed her attention to the front of the office, she independently identified the petitioner. Moreover, Detective Schreiber testified from a police report that Maria Ramos had already identified the petitioner as "Boogie" on June 15, 1976, and had identified him as the man . . . [who] "stabbed the victim in the chest" and also held the victim "while . . . [another man] stabbed the victim about the chest area." (Trial transcript at 648–649.) This was one day prior to the identification in the district attorney's office.

Even if the Court had found the procedure to be unnecessarily suggestive, the identification, viewed under the totality of circumstances, was reliable. In *Neil v. Biggers,* the Supreme Court set out the factors to be considered in evaluating reliability:

> (1) opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation.

*Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Applying these factors, the Court finds that the identification was reliable. Maria Ramos was standing against a wall across the street from the struggle and she had the opportunity to view the struggle and see the three men involved. (Trial transcript at 310, 312–320, 357–358). Her attention [3]

---

3. Trial transcript as noted at 312–320 demonstrates her degree of attention. This testimony is in contrast to her testimony that "everything was fast. I don't know if I did see his [Jose Rodriguez] face. I wasn't paying too much attention." (Trial transcript at 380.)

was focused on the struggle,[4] especially since she knew the people involved, including the victim, Ratone, who had given heroin to her in the past. Shortly after the struggle, Maria Ramos identified the men involved in the struggle as Ratone, Edgar Alicea [5] and a twenty-eight to twenty-nine-year-old, short, fat Spanish man wearing a green shirt. (Trial transcript at 689.) She later identified the short, fat Spanish man as Jose Rodriguez and apparently it is an accurate description of him.[6] Finally, Maria Ramos identified Jose Rodriguez tentatively one day after Ratone's death, and with certainty two days after the death.

On these facts, the Court cannot say that the petitioner was denied a fair trial by the admission of the challenged identification testimony. Therefore, the Court must consider the identification evidence in assessing the sufficiency of the evidence.

### C. *Sufficiency of the Evidence*

The standard to be applied in a federal habeas corpus proceeding when a claim is made that a person has been convicted in a state court upon insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Once a defendant has been found guilty of the crime charged, all of the evidence must be considered in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *United States ex. rel. Newell v. Mizell*, 667 F.2d 1247, 1248 (7th Cir.1982).

■ After an examination of the trial transcript, viewed in the light most favorable to the state, the Court finds that there was sufficient evidence to convict the peti-

tioner. Edwin Alicea and Edgar Alicea testified that the petitioner was involved in the struggle that lead to Ratone's death. (Trial transcript at 441, 220.) Maria Ramos testified that she "saw the hand of Boogie into the chest of Ratone," and Detective Schreiber testified that Maria Ramos stated in a police report that the petitioner stabbed Ratone while Edgar Alicea held Ratone. (Trial transcript at 313; Trial transcript at 648–649.) Even Maria Rodriguez testified that the petitioner was standing right next to Ratone when Ratone was knifed to death. (Trial transcript at 500.)

### IV. THEORY OF DEFENSE INSTRUCTION

■ The petitioner next argues that the trial court violated the petitioner's due process rights by conditioning the giving of a theory of defense instruction upon the giving of a similar instruction on behalf of the prosecution.

"Generally, in a habeas corpus action where the petitioner alleges constitutional error due to the trial court's refusal to allow a defense instruction, the constitutional question is limited to whether the petitioner sufficiently alleges a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *United States ex. rel. Stamps v. Hartigan*, 586 F.Supp. 1575, 1577 (N.D.Ill.1984) (citing *United States ex. rel. Peery v. Sielaff*, 615 F.2d 402, 404 (7th Cir.1979); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)). "Where it is the omission of an instruction that is at issue, the petitioner's burden is 'especially heavy' because '[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *United States ex rel. Peery v. Sielaff*, 615 F.2d 402, 404 (7th Cir.1979).

---

**4.** Although her attention was strongly focused on Ratone, she had an opportunity to view the petitioner as well since he was involved in a close-range struggle with Ratone.

**5.** Maria Ramos identified Edgar Alicea as being involved in the struggle and stabbing. However, Edgar Alicea later passed a polygraph examination and all charges were dropped. Although this troubles the Court, it does not impact on her identification of the petitioner and

there may be explanations for her misidentification of Edgar Alicea. For example, Maria Ramos' boyfriend at the time of trial was a friend of Jake Navarro, the person the state suspects was the third person involved in the struggle.

**6.** The Court never had the opportunity to see the petitioner, instead it relies on the fact that the petitioner did not challenge Maria Ramos' description of him.

In this case, the absence of a theory of defense instruction did not result in a complete miscarriage of justice. Based on a review of the trial transcripts, the Court believes that the petitioner's trial attorney effectively argued the theory of defense to the jury. The petitioner's defense consisted of a challenge to the credibility of the eyewitnesses and the reliability of their identification testimony. Petitioner's trial attorney effectively challenged the credibility of witnesses throughout the trial and in closing arguments. (Trial transcript at 796–806.) In addition, the trial court instructed the jury on identification testimony and the credibility of witnesses as follows:

Now, as to the question of identification, in this case the defendant has challenged the question of the identity of the person or persons who committed the crime.

If you find that the crime of murder in the first degree was committed, before you may find the defendant guilty of that crime, you must be satisfied beyond a reasonable doubt that the defendant, Jose Cruz Rodriguez, was the person who actually committed it.

In other words, you are first to determine whether or not the offense of murder in the first degree was proven to you. If you find that to be the case, you must then consider whether or not you are convinced of the identification of the defendant as the person who committed that crime or aided or abetted that commission, and you must be convinced of that beyond a reasonable doubt.

Now, as to the credibility of the several witnesses that came before you, it is the duty of the jury to scrutinize and weigh the testimony of the witnesses and to determine the effect of the evidence as a whole. You are the sole judges of the credibility of the several witnesses and of the weight and credit to be given to their testimony.

In determining the weight and credit you should give to the testimony of each witness, you should consider his interest or lack of interest in the result of this trial, his conduct and demeanor on the witness stand, his bias or prejudice, if any has been shown, the clearness or lack of clearness of his recollections, his opportunity for observing and knowing the matters and things testified to by him, and the reasonableness of his testimony.

You should also take into consideration the apparent intelligence of each witness, the possible motives for falsifying, and all other facts and circumstances appearing on the trial which tend either to support or to discredit his testimony, and then give to the testimony of each witness such weight and credit as you believe it fairly entitled to receive.

Now, furthermore, as to the credibility of witnesses, evidence has been received to the effect that some of the witnesses in this trial, namely, Edwin Alicea, Edgar Alicea, Maria Rodriguez, and the defendant, Jose Cruz Rodriguez, have heretofore been convicted of a crime, and you were told of that fact. Now, this evidence was received solely because it bears upon the credibility of the witnesses' testimony. The law assumes that a witness who has been convicted of a crime may not be as worthy of belief as a witness who has never been convicted of crime, and the fact of conviction is one that you may take into consideration in weighing the testimony of the witnesses who appeared before you, Edwin Alicea, Edgar Alicea, Maria Rodriguez, and the defendant, Jose Rodriguez. It must not be used for any other purpose.

I will repeat the crux of that statement. The law assumes that a witness who has been convicted of crime may not be as worthy of belief as a witness who has never been convicted of crime, and the fact of conviction is that you may take into consideration in weighing and determining his or her credibility. It must not be used for any other purpose.

Trial transcript at 821–823.

## V. EFFECTIVE ASSISTANCE OF COUNSEL

The Court of Appeals for the Seventh Circuit recently discussed the standards to be applied when analyzing a challenge to the effectiveness of counsel:

In analyzing a sixth amendment challenge to the effectiveness of counsel, we are bound by the stringent standard of *Strickland v. Washington,* 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984). In *Strickland,* the Supreme Court held that a defendant bears the burden of showing: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. As to deficient performance, the Court stated:

> [T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.
>
> Judicial scrutiny of counsel's performance must be highly deferential ... [E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time ... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 [104 S.Ct. at 2065] (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 [76 S.Ct. 158, 164, 100 L.Ed. 83] (1955)). The Court explained the prejudice component as follows:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* [466 U.S.] at 694 [104 S.Ct. at 2068].

The Court went on to explain that if the defendant makes an insufficient showing on either component of the inquiry—performance or prejudice—a court need not address the other component. Id. at 697. Thus, the defendant bears a heavy burden in proving a claim of ineffective assistance of counsel. In evaluating the decisions of counsel, we must apply the highly deferential standard set out above and ask whether those decisions, viewed from counsel's perspective at the time, might be considered sound trial strategy. In evaluating the effect of any errors on the part of counsel, we must ask not whether there is a possibility that the outcome was affected but whether there is a reasonable probability that absent the error the result would have been different. *Kubat v. Thieret and Hartigan,* 867 F.2d 351, 359–60 (7th Cir.1989).

### A. *Identification Testimony*

■ The petitioner claims that he was denied the effective assistance of counsel when his trial attorney failed to make a motion to suppress the identification testimony of Maria Ramos. However, at a post-conviction proceeding, the petitioner's own expert testified that "it would not have been below the standard to fail to bring a motion prior to trial but I believe that as the testimony developed during the course of the trial it did fall below that standard to fail to bring a motion, at least at the close of the state's case in chief." (Transcript of post-conviction proceedings of September 27, 1985 at 4.)

The petitioner's trial attorney explained at a post-conviction proceeding that he considered bringing a motion to suppress, but decided against it, primarily because Maria Ramos and Jose Rodriguez knew each other prior to the night of June 14, 1976. (Transcript of post-conviction proceedings of June 25, 1985 at 13–14.) In addition, the attorney took the position that there was no issue as to whether or not Jose Rodriguez was actually present at the scene at one time or the other, therefore, he did not think it was necessary to suppress the identification testimony. (Transcript of post-conviction proceedings of June 25, 1985 at 14.) Finally, the attorney believed that Maria Ramos was "positively going to be an incredible witness in any event." (Transcript of post-conviction proceedings of June 25, 1985 at 14.)

The fact that Maria Ramos and Jose Rodriguez knew each other also troubled the petitioner's expert, who stated "frankly that is the one point that caused me a great amount of difficulty in attempting to analyze the case." (Transcript of post-conviction proceedings of September 27, 1985 at 9.) However, the second reason given by the petitioner's trial attorney, that there was no issue as to whether Jose Rodriguez was actually present, misses the fact that a motion to suppress identification would have sought not to suppress her identification of Mr. Rodriguez as a person who was there but rather to identify that Mr. Rodriguez was the person who stabbed the victim." (Transcript of post-conviction proceedings of September 27, 1985 at 11.) Finally, the petitioner's trial attorney did an effective job of cross-examining Maria Ramos and showing her weaknesses.

The Court determines that trial counsel's decision not to bring a motion to suppress Maria Ramos' identification testimony was not deficient. The Court rejects the petitioner's argument that a defense attorney should not assess the strength of a motion before bringing it. To the contrary, a defense attorney has an obligation not to bring frivolous motions. In this instance, the petitioner's trial attorney assessed the strength of a motion to suppress and determined that because Maria Ramos and Jose Rodriguez knew each other, a motion to suppress would have failed. Even the petitioner's expert admitted that the success of a motion to suppress was "questionable." (Transcript of post-conviction proceedings of September 27, 1985 at 21.) Thus, the petitioner's trial attorney's strategy was instead to cross-examine Maria Ramos and expose her weaknesses to the jury. The petitioner has failed to make a sufficient showing that his trial counsel's performance was deficient, thus, the Court need not address whether the petitioner made a showing that he was prejudiced by his trial counsel's performance. *Kubat*, 867 F.2d at 360.

### B. *Theory of Defense Instruction*

■ The petitioner claims that he was denied the effective assistance of counsel when his trial attorney waived his right to submit a theory of defense instruction to the jury.

The petitioner's attorney initially requested a theory of defense instruction but withdrew the request when the court offered to give a theory of defense instruction only on the condition that the state also be permitted to present a theory of the prosecution instruction. The appellate court held that any error that may have occurred as a result of the trial court's ruling was waived by the petitioner because his attorney never presented a specific theory of defense instruction to the trial court and, in addition, failed to object on the record to the manner in which the trial court entertained the general request. *Rodriguez v. State*, 111 Wis.2d 701, 332 N.W.2d 312 (Ct.App.1983). The petitioner therefore claims that his trial attorney's performance was deficient and prejudicial.

At a post-conviction proceeding, the petitioner's trial attorney testified that he recalled making the strategic decision to withdraw his request for a theory of defense instruction because of the trial court's condition that the state also be permitted to submit a theory of the prosecution instruction. (Transcript of post-conviction proceeding on June 25, 1985 at 12.) Petitioner's trial attorney further testified that the benefit of a theory of defense instruction was that it gave credibility to the defense by having the theory of defense come from the judge's mouth. The benefit, however, was reduced by the court also giving the theory of the prosecution. The attorney concluded that it would not be in the petitioner's best interests to request a theory of defense instruction in light of the trial court's ruling. The trial attorney felt that he could just as effectively present his theory of defense in closing argument to the jury. The attorney further felt that he had made a sufficient record and preserved the issue for appeal. (Transcript of post-conviction proceeding on June 25, 1985 at 12.)

This Court determines that trial counsel's decision to withdraw the request for a theory of defense instruction was not deficient. Counsel evaluated the advantages and disadvantages of requesting a theory of defense instruction and in light of the trial

court's conditions, reasonably decided to withdraw the request. It was sound trial strategy. Further, counsel believed that he had preserved the issues for appeal. The trial court made the following record:

"the theory of defense instruction was requested; not specifically, but generally the Court responded to the position that if the defense would like an opportunity to give the Court the theory of defense, that the Court also felt bound to give the theory of prosecution to be fair to both sides. Mr. Murray has stated that in view of the Court's position, he would withdraw the request for theory of defense instruction. I think the record should reflect he did withdraw it upon what the Court would do as to both, and that he did not just volunteer, so the record is made in that light."

(Trial transcript at 785.)

When viewed from counsel's perspective at the time, it was reasonable for counsel to believe he had preserved his record for appeal and hence it was unnecessary to draft a proposed theory of defense. Moreover, the petitioner was not prejudiced by counsel's failure to submit a proposed instruction because counsel effectively argued his theory of defense during closing arguments. Thus, the Court denies the petitioner's argument that he was denied effective assistance of counsel when his counsel failed to submit a proposed theory of defense instruction.

### C. *Polygraph Examination*

 The petitioner claims that he was denied the effective assistance of counsel when his trial attorney failed to pursue his request to take a polygraph examination.

In 1976, when this case was tried, the controlling case law allowed polygraph examinations to be admitted into evidence provided the district attorney, defendant and defense counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs, and the examiner's opinion thereon on behalf of either defendant or the state. *State v. Stanislawski*, 62 Wis.2d 730, 742, 216 N.W. 2d 8 (1974). At a post-conviction hearing, petitioner's trial attorney testified that

*Stanislawski* stipulations were two-edged swords. Under a *Stanislawski* stipulation and in the court's discretion, the results of a polygraph examination could be admitted into evidence even if the petitioner failed the examination. (Transcript of post-conviction proceedings on June 25, 1983 at 20–22.) Thus, it was reasonable, considering the risk involved, for counsel not to pursue the petitioner's request to take a polygraph examination. The Court denies the petitioner's claim that it was ineffective assistance for counsel to fail to pursue his request to take a polygraph examination.

### D. *Verbatim Translation*

 The petitioner claims that he was denied the effective assistance of counsel when his trial attorney failed to insist that the court interpreter give a verbatim translation of Maria Ramos' testimony. However, the petitioner can not cite to any specific instances where the court interpreter failed to give a verbatim translation of Maria Ramos' testimony, save one time when counsel objected to the translation. Moreover, an examination of the trial transcript indicates that the majority of Maria Ramos' testimony was in English, thus, reducing the possibilities for inaccurate translations. Even assuming that trial counsel failed to insist on verbatim translations, the petitioner has failed to establish a showing of prejudice. Thus, the Court denies the petitioner's claim that he was denied the effective assistance of counsel.

## VI. RIGHT TO CONFRONT AND CROSS–EXAMINE ACCUSERS

 The petitioner claims that he was denied his constitutional right to confront and cross-examine his accusers when the court interpreter failed to give a verbatim translation of Maria Ramos' testimony. However, Maria Ramos testified for the most part in English and infrequently used the court interpreter. In addition, the petitioner can cite to no specific instances of the interpreter's failure to give a verbatim translation of Maria Ramos' testimony when she testified in Spanish. In fact, the petitioner does not even indicate which of the two interpreters made the alleged mistakes in translation. Moreover, the petitioner's trial counsel was able to effectively

cross-examine Maria Ramos despite the necessity for a interpreter at times. The Court denies the petitioner's claim that he was denied his right to confront his accusers.

## VII. CONCLUSION

Based on the foregoing opinion, the Court DENIES the petition for a writ of habeas corpus.

SO ORDERED.